PARSONS, Assignee, etc., *v.* CASWELL and others.

(*Circuit Court, E. D. Wisconsin.*   January 5, 1880.)

BANKRUPT LAW—UNLAWFUL PREFERENCE OF CREDITOR.—Although, under a sound construction of the bankrupt law, mere passive non-resistance by the insolvent debtor will not defeat a judgment and levy where the debt was due and there was no defence to the same, still, very slight evidence of an affirmative character of a desire to prefer a creditor, or of acts done to secure such preference, may be sufficient to invalidate the whole transaction.

   Circumstances in this case considered, and *held* sufficient to establish the fact that certain judgments were obtained and executions levied through the secret co-operation of an insolvent debtor, and were therefore void.

*F. C. Winkler,* for complainant.

*E. Mariner,* for defendants.

DYER, J.   This is a bill filed by complainant, as assignee in bankruptcy of Albert W. Coe, to annul and set aside certain execution levies in favor of certain creditors of the bankrupt, as fraudulent under the bankrupt law.   The bill not only charges that judgments were obtained and the levies made for the purpose of securing to judgment creditors unlawful preferences, but attempts to charge that such judgments were obtained by actual collusion between the parties, and that some of the claims in favor of these creditors were in whole or in part fictitious, and had no foundation in actual indebtedness.   Upon the argument the bill was much criticised by counsel for defendants, as insufficient in respect of such charges.   However liable the bill may be to such criticism, I deem its allegations sufficient as charging the procurement of forbidden preferences by means of the judgments and levies, and through the aid and co-operation of the bankrupt.

   The bill also seeks to avoid and set aside certain transfers of personal property made by the bankrupt to the defendant Caswell, to secure certain indebtedness owing by the former to the latter, and the allegations of the bill are also sufficient to the extent that they charge such transfers to have been preferential and unlawful.

   Counsel for complainant, upon oral argument and in writ-

ten brief, attacked certain claims upon which the judgments in question were obtained as fictitious, and as created solely for the purpose of using them to accomplish, through the in- strumentality of judgments and execution levies, fraudulent transfers of the bankrupt's property.

In deciding the case I shall proceed upon the assumption that all of the claims, as well those upon which judgments were obtained as those to secure which transfers of property were made to the defendant Caswell, were genuine and valid, and represented *bona fide* indebtedness from the bankrupt to the parties respectively holding such claims. And the single question will be considered in the light of the evidence, whether or not the judgments, executions, levies and transfers in ques- tion were obtained and made in contravention of the bank- rupt law.

The bankrupt was a hardware merchant doing business in the city of Milwaukee. On the second day of November, 1876, the following judgments were entered against him in the state court, and executions were immediately levied upon his entire stock, except such portions as had been transferred to the defendant Caswell to secure other claims upon which judg- ments were not obtained, and to which more particular refer- ence will hereafter be made: One judgment in favor of the defendant Caswell for $5,776.42; one in favor of Albert E. Coe, the father of the bankrupt, for $1,892; one in favor of Charlotte E. Coe, the wife of bankrupt's brother, for $1,161.04; one in favor of Orra E. Benedict, sister of the bankrupt, for $3,987.75; a second judgment in favor of the defendant Caswell for $2,551.95; and a second judgment in favor of the defendant Albert E. Coe for $567.78; the total amount of these judgments being $15,936.94. The judgment in favor of the defendant Caswell for $5,776.42 was rendered upon the fol- lowing demands: A judgment note for $4,780.76, dated July 3, 1876, due in one day; a judgment note for $340, dated June 20, 1876, due in 30 days; a note for $400, dated March 13, 1876, due in six months; a note for $200, dated April 30, 1875, due August 1, 1876; a note for $200, dated April 30, 1875, due September 1, 1876; a note for $250, dated Sep-

tember 20, 1876, due on demand; a note for $759.44, dated March 7, 1876, due in six months, and also a claim for three months' rent of store. The second judgment in favor of defendant Caswell, for $2,551.95, was entered upon a judgment note for $2,500, dated October 5, 1876, and due on demand; the judgment in favor of Albert E. Coe, for $1,892, was entered upon a note for $1,800, dated July 3, 1876; the second judgment in favor of the same party, for $567.78, was entered upon a note for $500, dated February 28, 1876, and due in four months; the judgment in favor of Charlotte E. Coe, for $1,161.04, was entered upon a judgment note for $1,092.75, dated July 5, 1876, and due in one day; the judgment in favor of Mrs. Benedict, for $3,987.75, was entered upon a judgment note for $1,000, dated June 12, 1875, due in one day, and another judgment note for $3,000, bearing the same date, and due in one year from date.

The suits in favor of the defendants Caswell on his $2,500 note, and Albert E. Coe on his $500 note, were commmenced October 12, 1876, and the other four suits were all begun on the same day, namely, September 23, 1876. In all the cases judgments were entered by default, and executions and levies were at once and simultaneously issued and made.

The transfers of property by the bankrupt to Caswell, to secure demands not put in judgment, and which are also by this bill sought to be set aside, were respectively made September 23 and October 28, 1876.

The execution levies upon the bankrupt's stock necessarily closed his business, and bankruptcy proceedings were instituted against him on the sixteenth day of November, 1876. If the judgments, execution levies and transfers in questions are sustained, it is understood that they exhaust the entire assets of the bankrupt, except uncollected merchandise accounts, many of which are worthless; and the great question in the case, and one which the court has very carefully considered, is, ought these judgments, levies and transfers, in the light of the facts and circumstances developed by the testimony, to stand as valid securities in favor of the defendants? And this question is settled when it is determined whether or

not the bankrupt co-operated in the transactions in question; that is, whether he did or did not, within the meaning of the bankrupt law, secure to these creditors preferences, by procuring his property to be taken on executions, for the purpose of satisfying the demands of these judgment creditors. If he did, then no matter what may be the resulting hardship to these creditors, these judgments and levies must fall, because they were obtained and made within the period before bankruptcy proceedings were commenced, which enables the assignee to attack them.

In *Wilson* v. *City Bank*, 17 Wallace, 473, the supreme court decided that, under a sound construction of the Bankrupt Act, something more than passive non-resistance in an insolvent debtor is necessary to invalidate a judgment and levy on his property, when the debt is due and he has no defence; that in such a case there is no legal obligation on the debtor to file a petition in bankruptcy to prevent the judgment and levy; and that a failure to do so is not sufficient evidence of an intent to give a preference to the judgment creditor, or to defeat the operation of the bankrupt law. The court, speaking through Justice Miller, was at the same time careful to say that "undoubtedly very slight evidence of an affirmative character of the existence of a desire to prefer one creditor, or of acts done with a view to secure such preference, might be sufficient to invalidate the whole transaction. Such evidence might be sufficient to leave the matter to a jury or to support a decree, because the known existence of a motive to prefer, or to defraud the bankrupt act, would color acts or decisions otherwise of no significance. These cases must rest on their own circumstances." And it is noticeable of *Wilson* v. *The Bank* that it was a case destitute of any evidence of the existence of such a motive, unless it should be imputed, as a conclusion of law, from facts which the court did not think raised such an implication. Each case, then, must rest on its own circumstances, and it is apparent that the rule declared by the supreme court, that slight evidence of an affirmative character of the existence of acts done with a view to secure a preference may be sufficient to invalidate the

transaction, is a reasonable and proper one, because in many cases, as the court says in the case of Baker, 14 N. B. R. 436, "parties intend that the debtor shall preserve a nice equilibrium between acquiescence and co-operation," and under such circumstances the role is so difficult that slight *indicia* suffice to show that it has failed. In such cases courts are justified in being critical to detect these *indicia,* and should accord them ample weight when discovered."

Guided by this rule, which, as we have seen, has the sanction of the supreme court, we may proceed to look into the circumstances of this case. Publicity was given to the failure of the bankrupt on the second day of November, 1876, when his stock of goods was seized under the executions. That he was insolvent—that is, unable to meet his paper as it matured in the ordinary course of business—on and before September 23, 1876, is, I think, established beyond the necessity of discussion. The testimony shows that throughout the summer of 1876 his business was dull; that unusual measures were from time to time necessary to enable him to proceed successfully, and that, in fact, during that season, and at a time considerably anterior to his actual failure, failing circumstances began to be developed. That the defendants were chargeable with reasonable cause to believe the debtor to be insolvent, and that most of them knew that he was insolvent when they commenced their suits, is in my judgment equally well established. As we have seen, four of the suits were begun on the same day; two of them were begun on a later day, namely, October 12, 1876, and all the judgments were simultaneously entered. The executions were also simultaneously issued and levied, so that it appears to have been the intent that all of these judgment creditors should stand with reference to themselves upon an equal footing, and that all should secure an equal preference over other creditors who had no knowledge of these proceedings and were taking no steps to obtain security.

The defendant Albert E. Coe was the bankrupt's father, living in the state of New York, and I am convinced that, in

the steps taken to obtain judgments in his favor, the defendant Caswell acted as his agent.

The defendant Orra E. Benedict was the bankrupt's sister, living in Milwaukee. The defendant Charlotte E. Coe was the wife of bankrupt's brother, L. W. Coe, and he was the bankrupt's book-keeper and confidential clerk. The defendant Caswell had at some time been a hardware merchant in Milwaukee, had previously sold to the bankrupt his stock, was or had been the bankrupt's landlord, had had many business transactions with him arising out of loans of money, had evidently been for a considerable time in intimate business relations with the bankrupt, and at the time the suits in question were begun and the judgments rendered occupied as his office a room partitioned off in the bankrupt's store. All the suits upon which the judgments in question were rendered, were begun in a manner that avoided publicity until the judgments were rendered and execution issued, though this is a circumstance which I esteem of no consequence, since it involved nothing wrongful or unlawful on the part of the creditors.

It appears from the testimony that one Phelps, a salesman for certain creditors of the bankrupt in Chicago, was in Milwaukee on the twenty-first day of October, to look after the interests of his firm, certain agencies having reported that the bankrupt was refusing payment, or that his paper was being protested. This was after the suits in question had been begun, and this witness testifies that the bankrupt told him there was no reason for such reports; that there was no real foundation for any reports affecting his credit, and that he gave a sort of general assurance that he was solvent. Again, this witness was in Milwaukee on the second day of November, which was the day when the judgments were rendered, and he testifies that he asked the bankrupt if any suits had been commenced against him; that the bankrupt replied that two or three suits had been commenced in justices' courts for small amounts; that he had procured one or two to be adjourned, and that he would not allow judgment to be entered against him in favor of any one against the interests of all

the creditors.  No information was communicated to the witness of the six suits which were then pending in the state court, and in which judgments were rendered on that very day.  This was deceit on the part of the bankrupt, and it is not mitigated by anything which the bankrupt in his own testimony says upon the subject, for he admits that he had the alleged conversation with Phelps; that Phelps asked him whether there were suits commenced against him; that he answered that there were such suits in justice courts, and that these suits did not involve more than $600; and in his answer to the petition in bankruptcy, sworn to November 27, 1876, he admits that he did not tell Phelps that the suits in which judgments were recovered were then pending.  Here, then, was a creditor from abroad, who was seeking information directly from the bankrupt with reference to his financial condition, inquiring as to suits—as to *any* suit brought against him—and he is diverted from his line of inquiry and misled as to the real facts, by what is shown to have been clearly a deliberate suppression of a most vital fact, that on that very day cases pending against him in the state court in favor of relations and another creditor, to the amount of $15,000, were ripe for judgment.  Surely, this alone is a powerful circumstance of an affirmative character, tending to show at least the existence of a desire on the part of the bankrupt to prefer these creditors.  In another part of his testimony he says that he does not know that he informed any creditor of the pendency of these suits against him, and that he does not think he would be apt to do so; and this would be undoubtedly true, if he was desirous that by means of judgments these creditors should obtain preferences, and especially if he was at the time by any affirmative action facilitating such a result.  It is true the bankrupt further testifies that he thought he should get through and pay his debts, but that is no excuse for suppressing the truth when direct inquiry was made of him by one of his creditors, and is too unsubstantial to remove what appears to be good grounds for the belief that he was actuated by a motive to hide from view the movements of other creditors to secure preferences.

It appears further that one of the notes embraced in the first suit commenced by the defendant Caswell, namely, a note for $250, was made on the twentieth day of September, 1876, three days before the suits were commenced, and was made payable on demand; that the note upon which the defendant Caswell, on the twelfth day of October, 1876, commenced his second suit, was made on the fifth day of October, 1876, was payable on demand, and was, moreover, a judgment note. It appears also that the demand for $1,800 in favor of the defendant Albert E. Coe had been, previous to the time when suit was commenced, included in obligations against the bankrupt held by the defendant Caswell, and when it became necessary to bring a suit in favor of Albert E. Coe by name, it was essential that the obligation should run to him, and so, at Caswell's request, the bankrupt at that time gave a note for $1,800 running to his father, and which was dated back to July 3, 1876, and made payable in one day from date, and the defendant Caswell testifies that, although he does not remember what he said to the bankrupt when this $1,800 note was thus made, he did say to him in substance "what the case would require." It should be further stated that when this $1,800 note was thus given the amount of it was indorsed upon the note held by Caswell, and which had, up to that time, included the $1,800.

As I understand the testimony, the notes of Mrs. Benedict and Mrs. Charlotte E. Coe were, prior to the commencement of the suits in their favor, kept in the bankrupt's safe in his store, and were withdrawn from the safe for purposes of suit. In this connection the circumstances are significant that the commencement and pendency of the suits brought by Mrs. Charlotte E. Coe and Mrs. Benedict in no manner disturbed their relations with the bankrupt, nor was there any interruption of the business and confidential relations existing between the bankrupt and his brother, L. W. Coe, the husband of Charlotte E., for he continued to be the bankrupt's book-keeper and clerk, or agent, until the failure, although, as the testimony shows, he was attending to the

suit in behalf of his wife, and had also assisted Mrs. Benedict in the commencement of proceedings in her behalf. Mrs. Benedict testifies that she lived opposite the residence of the bankrupt; that not a word was said between them about her suit, and that it did not disturb their relations. The testimony shows that even after the suits were commenced, and up to the twenty-first of October, 1876, the bankrupt continued to order goods from houses in Chicago and elsewhere, buying upon credit and giving notes payable at times when he must have known he could not pay them, and all this when he likewise knew that suits were pending against him, and were almost ripe for judgment, to the amount of $15,000, in favor of relations and of the defendant Caswell; and it appears that goods were thus ordered, not only by letters written personally by the bankrupt, but by letters and orders written and given in his behalf by L. W. Coe, his brother and book-keeper, who of course knew of his condition, and was acting at the very time as the agent of his wife in measures then in progress to secure to her the position of a preferred creditor by means of a judgment in the suit in her favor then pending. In a letter of date September 16, 1876, written by L. W. Coe, the bankrupt orders from Rathbone, Sard & Co., at once, a quantity of stoves. In a letter dated September 28, 1876, written by L. W. Coe for the bankrupt to A. A. Thompson & Co., a small remittance of $227 was enclosed; collections were spoken of as very slow, and an order for goods to the amount of over $1,000 was also sent. On the fourth day of October, 1876, the bankrupt, by letter, ordered from the Vulcan Iron & Nail Company two car loads of nails, one on 60 days' time, and one at four months. On the twelfth day of October, 1876, the bankrupt wrote to Rathbone, Sard & Co., ordering stoves. In a letter of October 13, 1876, written by L. W. Coe to Dwight Bros. & Co., he ordered three tons of felt paper, and in a letter of same date, written to Barrett, Arnold & Kimball, three tons of tarred felt paper were ordered, and on the twenty-first of October, 1876, he wrote to the Chicago Stove Works, sending them five notes, amounting in all to nearly $2,500, and in which letter he

says that he has spread the accounts along through the following months of December, January and February, and tells them he presumes they have heard reports concerning him, but that they must not be alarmed, and he orders from them more goods.

Upon an examination of the accounts and books of the bankrupt the complainant assignee has testified that after September 23, 1876, when the suits in question were commenced, the bankrupt received new goods to the amount of over $13,600, and that for these goods he had paid in cash but about $2,300, the balance, amounting to over $11,300, having been purchased on credit. Such conduct on the part of the debtor, at a time when the circumstances indicated so clearly that he must have known that he was hopelessly insolvent, and when all of these suits were hanging over him, makes it difficult to believe that his was the struggle of an honest debtor to weather the storm, but rather inclines a disinterested mind strongly to the conclusion that his purpose was rather to accumulate a fund which should beyond peradventure secure full payment to favored creditors, especially when we find that at the last his total liabilities amounted to over $60,000, with a reasonable certainty that these creditors, by virtue of their levies and transfers, will exhaust his available assets.

Another circumstance sworn to by the defendant Caswell is this: Just before the levies there were some old goods belonging to the bankrupt upon Caswell's premises, which had been previously sold by Caswell to the bankrupt, and two or three days before the levies they were removed to the bankrupt's premises, and Caswell testifies that the bankrupt's men removed them by Coe's order; that it was "because they were going to be levied on," or, as Caswell expresses it in another part of the testimony, they were taken out "so as to be levied on, to be in the hands of the sheriff," as he, Caswell, did not want anything on his premises that would be levied on.

As avoiding the effect of this circumstance, counsel for defendants relied upon the case of *Louchien & Brother* v. *Henzy,*

18 N. B. R. 173, in which it was held that the mere fact that the debtor brought or caused goods to be brought within reach of execution, a short time before the sheriff's sale, which was closely followed by the commencement of proceedings in bankruptcy against him, is not sufficient to invalidate the sale. It is to be, however, observed of this case that it was because the single act of the debtor was unconnected with any other suspicious or doubtful circumstances that it was held insufficient to vitiate the whole sale—"*the mere fact* that the debtor brought or caused goods to be brought," etc., says the court. But in the case in hand we have many other circumstances which tend to taint the transactions in question, and, this being so, the removal of goods for the purpose of being levied upon forms a link in the chain, and by relation with other circumstances attains significance which it might not possess if it were an isolated circumstance alone relied upon to invalidate the transaction.

From the first of July, 1876, to the time of the bankrupt's failure, his note and bills-payable book shows a steady addition to the volume of his liabilities, only insignificant amounts being paid, except that as late as October 26th and 28th he paid to his wife's sister, a Mrs. Cleveland, $740, in full satisfaction of notes which he had given her as late as October 13th, and 14th, payable on demand, and one of which, as I understand the testimony, was a renewal of a note given in September. Goods which he purchased on credit, after the suits in question were begun against him, were among those levied upon to satisfy the executions.

Other transactions still transpired between the bankrupt and the defendant Caswell which tend to color the whole case. On the twenty-third of September, 1876, which was the day when the suits were begun, the bankrupt gave to Caswell his note for $619.25, due in 30 days, and transferred and delivered to him goods, most of which were new, as security for the payment of the note; and on the twenty-eighth day of October, 1876, he gave to Caswell another note for $535.69, payable on demand, and transferred and delivered to him, as security for the payment of this note, still other

goods, most or all of which were new goods. It is true that each of these notes represented in aggregate other liabilities previously existing, and for some or all of which Caswell had a certain character of security; but the giving of these new notes at such a critical time, and when the suits in question were commenced or pending, and for the payment of which the bankrupt, as I read the testimony, then gave to Caswell greater and better security than he before had, evidences an intention on the part of Caswell to acquire such security, and on the part of the bankrupt to give such a preference, as the law under the circumstances forbids; and this goes not only to the validity of these transfers themselves, but, as I have said, colors all the transactions under investigation, so far as motive, intent and acts are concerned. It is true that upon the liabilities which made up the note of $535.69 Caswell had a certain character of security in the shape of a chattel mortgage, and a lease which contained a clause transferring to Caswell the personal property upon the leased premises, but it is very doubtful whether this security was valid, and it is evident that it was not relied upon as possesing the value which the emergency required. It is noticeable, also, that one of the notes which went into and formed part of the note for $535.69, namely, a note for $156.93, was not then due, and I am clearly of the opinion that these two transactions did not constitute an exchange of securities which may be protected within the rule laid down by the supreme court, and certainly, transpiring as they did, just on the eve of the bankrupt's failure, they tend strongly to show a deliberate purpose on the part of the bankrupt to prefer his creditor by giving to him the best security at his command. It was urged, upon the argument by the learned counsel for defendants, that the notes upon which the judgments in question were rendered were judgment notes; that the judgments were not obtained as speedily as they might have been, and that this is a circumstance tending to show that there was no such co-operation between the parties as will now be held to invalidate these liens; but all of the notes sued on were not judgment notes, and some were executed as if in preparation for

what followed, and it is quite evident that in the emergency it was by these judgment creditors deemed wise strategy to move unitedly for the accomplishment of the desired result.

There is testimony in the case to the effect that before suits were commenced by these judgment creditors the bankrupt begged further time from one or more of them; a fact which, if true, ought to be regarded by the court as a circumstance tending to repel the other theory of the case. But the testimony leaves it in serious doubt whether there was any very earnest expostulation after the suits were commenced, and it affirmatively shows that the bankrupt made no intercession with his father for further leniency, although he testifies that his father was a wealthy man in the state of New York. And the claim that after the suits were begun the bankrupt requested further delay, is quite inconsistent with his suppression of the fact that the suits were pending when he was inquired of by his creditors; and it is worthy of notice that, in his answer to the petition in bankruptcy, he in express terms admits that he was willing, in case he must fail, that the creditors who have recovered judgments should be paid in full, but he denied that he made any suggestion to any or either of them, directly or indirectly, that they bring suit and recover judgments, or levy their executions on his stock. And in his testimony in the present case he states that he had no particular desire in relation to those who sued him, except one, his sister, from which the implication follows that he *had* a particular desire with reference to the sister who had sued him.

On the whole, my opinion is that the circumstances of this case lead to the conclusion that the seizure of the bankrupt's property to satisfy the judgments in question was facilitated by the bankrupt; that the law was transgressed, and that these judgment creditors have secured illegal preferences, and in so holding I am not unmindful nor unappreciative of enunciations of the supreme court in this class of cases. I acknowledge the principle, so strongly enforced by that court, that something more than passive non-resistance in an insolvent debtor is necessary to invalidate a judgment and levy

under the bankrupt law; and if it be said that we have not, in the case at bar, direct proof of active participation by the bankrupt to facilitate his creditors in securing a preference, and that he was only silent under authorized legal proceedings, I must reply that the circumstances show it to have been but the outward silence of concealed co-operation. Decree for complainant.